UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ERIN R. YODER,                          :
                                        :CIVIL ACTION NO. 3:16-CV-212
          Plaintiff,                    :
                                        :(JUDGE CONABOY)
          v.                            :
                                        :
CAROLYN W. COLVIN,                      :
Acting Commissioner of                  :
Social Security,                        :
                                        :
          Defendant.                    :
                                        :

_____

**MEMORANDUM**

Pending before the Court is Plaintiff's appeal from the
Commissioner's denial of Disability Insurance Benefits ("DIB")
under Title II of the Social Security Act.  (Doc. 1.)  She alleged
disability beginning on July 17, 2011, and later amended the onset
date to August 17, 2012.  (R. 13, 38.)  The Administrative Law
Judge ("ALJ") who evaluated the claim, Sharon Zanotto, concluded in
her August 7, 2014, decision that Plaintiff's severe impairments of
lumbar and cervical spondylosis, mood disorder, anxiety disorder,
and personality disorder did not alone or in combination meet or
equal the listings.  (R. 15-17.)  She also found that Plaintiff had
the residual functional capacity ("RFC") to perform light work with
certain nonexertional limitations and that she was capable of
performing jobs that existed in significant numbers in the national
economy.  (R. 22-23.)   ALJ Zanotto therefore found Plaintiff was
not disabled.  (R. 23.)

With this action, Plaintiff asserts that the Acting

Commissioner's decision should be remanded for the following reasons: 1) the ALJ erred at step three of the sequential evaluation process by finding Plaintiff did not meet or equal listings 12.04 and 12.08 and by not evaluating her schizoaffective disorder under medical listing 12.03; 2) substantial evidence does not support the ALJ's evaluation of the opinion evidence; 3) substantial evidence does not support the ALJ's RFC assessment; 4) the ALJ improperly evaluated Plaintiff's GAF scores; and 5) substantial evidence does not support the ALJ's credibility assessment. (Doc. 11 at 2.)  After careful review of the record and the parties' filings, I conclude this appeal is properly granted.

## I. Background

### A.   *Procedural Background*

Plaintiff protectively filed for DIB on April 1, 2012.  (R. 13.)  The claims were initially denied on January 2, 2013, and Plaintiff filed a request for a hearing before an ALJ on February 20, 2013.  (*Id.*)

ALJ Zanotto held a hearing on July 21, 2014.  (*Id.*) Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Michael Kibler.  (*Id.*)  As noted above, the ALJ issued her unfavorable decision on August 7, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 23.)

2

Plaintiff's request for review of the ALJ's decision was dated September 23, 2014.  (R. 6-9.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on December 9, 2015.  (R. 1-5.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On February 8, 2016, Plaintiff filed the action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed the Social Security Administration Transcript (Doc. 9) on April 11, 2016, and her Answer (Doc. 10) on May 20, 2016. Plaintiff filed her supporting brief on May 25, 2016.  (Doc. 11.)  Defendant filed her brief on June 23, 2016.  (Doc. 12.)  Plaintiff filed a reply brief on June 29, 2016.  (Doc. 13.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.  *Factual Background***

Plaintiff was born on July 11, 1978, and was thirty-three years old on the alleged disability onset date.  (R. 22.) Plaintiff has a college education and has past relevant work as a clerk, cleaner, animal caretaker, laboratory assistant, home health aide, and cashier.  (R. 21-22, 46.)

**1.  Impairment Evidence**

*a. Mental Health Impairments*

At a February 10, 2012, visit to WellSpan Health, Plaintiff was seen by Todd I. Muneses, M.D., who noted that Plaintiff had a history of bipolar disorder and was referred by a friend due to

3

several medications being tried by her family physician.  (R. 518.)

He recorded the following history provided by Plaintiff:

> Erin reports that she was originally diagnosed with major depression with psychotic features back in 2002 that required hospitalization.  Over the years, she noticed periods of severe mood swings that were usually accompanied by spending sprees, euphoric feelings, promiscuity, hyperverbal speech, paranoia, and decreased need for sleep that would occur over 1-2 week periods.  She was eventually diagnosed with Bipolar Disorder in 2008.  Her last manic episode was about two months ago.  When depressed, she describes decreased motivation, decreased energy, increased isolation, erratic sleep, decreased interest in activities, poor concentration, increased appetite, hopeless feelings at times, and suicidal thoughts of the theme of "I don't' wanna be here."  She has had prior attempts, specifically overdosing on pills and cutting her wrists, but denies any intent now because "my kids keep me going."  She also reports crying spells that occur about every two months.  In terms of anxiety, she reports periods of shortness of breath and chest tightness that occur about one time per week.  She has been given Klonopin 0.5 mg daily that she takes for this with a good response.  She does avoid places where she is the center of attention, but denies any symptoms consistent with social phobia or obsessive-compulsive disorder.  She denies any psychotic symptoms currently.  The last was about two years ago when under significant stress of a pending divorce she felt she was hearing radio messages directed to her.

(R. 518.)  Dr. Muneses added that Plaintiff had been hospitalized for psychiatric reasons in 2002, 2009, and 2010, and had been treated at WellSpan in 2009 but was not being treated at the time of her visit.  (*Id.*)  He also noted that Plaintiff had sustained a

4

back injury in 2010 for which she was on pain medication.  (*Id.*)

Mental Status Exam showed that Plaintiff was

> alert and oriented to person, place, and
> time.  She was calm and cooperative
> throughout the session.  She denied any
> suicidal or homicidal ideation or plan as
> well as any auditory or visual hallucinations
> or delusions.  Her affect was considered
> pensive.  Her mood was "pretty good."  Her
> memory and concentration were considered
> grossly intact.  Her insight and judgment
> were considered fair.

(R. 519.)  He diagnosed "Bipolar Disorder; Rule out Bipolar

Disorder With Psychotic Features," and assessed a GAF score of 45.

(*Id.*)  Dr. Muneses adjusted Plaintiff's medications and noted that

she would call in three weeks to report on medication response and

return for a medication management appointment in six weeks.  (*Id.*)

On August 28, 2012, Plaintiff presented at Spring Grove Family

Care Center, for medication refills, disability paper work

completion.  (R. 340.)  She reported audio and visual

hallucinations which she had been experiencing for two months.

(*Id.*)  She was seen by Dr. Howard Farrington who assessed Plaintiff

to have schizophrenia, bipolar disorder, major depressive disorder,

and GERD.  (*Id.*)  His "Plan" was for Plaintiff to "see psych asap"

with the added note that the paperwork was completed.  (*Id.*)

On November 29, 2012, Plaintiff reported to Dr. Farrington

that she would like to make some medication changes and she had

homicidal and suicidal thoughts at times but no plan.  (R. 366.)

She was assessed to have bipolar disorder and anxiety, was

5

counseled for fifteen minutes and medications were continued.
(*Id.*)  No psychiatric issues were recorded at Plaintiff's visit
with Dr. Farrington on December 19, 2012, which was noted to be a
two week follow up appointment and also for Plaintiff's cough.  (R.
367.)

On December 17, 2012, Anthony J. Fischetto, Ed.D., conducted a
clinical psychological evaluation.  (R. 349-58.)  Plaintiff
reported that she had anxiety, depression, and "a little bit
schizophrenia."  (R. 349.)  She explained that she hears things
like her children crying in the middle of the night and sees things
like a person who looked like her husband's deceased brother.
(*Id.*)  She said this had started two months earlier, and she had
the anxiety and depression since she was younger.  (R. 350.)  Dr.
Fischetto noted that Plaintiff was on Depakote, Paxil, Xanax, and
Oxycontin which she reported were helping somewhat.  (R. 351.)  He
also noted that Plaintiff was not getting any therapy at the time.
(*Id.*)  Plaintiff told Dr. Fischetto that she was unable to work
because she has anxiety driving and she gets panicky and scared.
(*Id.*)  Dr. Fischetto found that Plaintiff appeared somewhat anxious
but she reported being happy at times.  (R. 352.)  He noted that
she appeared to have manic episodes where she would

> get very happy, feel on top of the world,
> talkative, mind racing, feel like she can do
> all these things.  At times, she thinks she's
> like Jesus, or Jesus himself.  She won't be
> able to sleep until 2:00 or 3:00 in the
> morning and then she'll crash down and get

6

> depressed.  She has some early morning
> awakening.  She has a fear of being
> suffocated.  Some vivid dreams.

(R. 352.)  Plaintiff said she had no thoughts of suicide at the

time and she had not heard voices recently.  (*Id.*)  Dr. Fischetto

found that Plaintiff's productivity of thought was spontaneous and

her continuity of thought was goal-directed with no looseness of

association.  (*Id.*)  Plaintiff identified some thought disturbances

she had in the past, including that her ex-husband was out to get

her and newspaper red print was the devil's handwriting and she was

Jesus.  (R. 353.)  Dr. Fischetto assessed that Plaintiff's abstract

thinking was good for similarities, she had an average fund of

information, she was slow for serial sevens but scored five out of

five, her memory was good in all aspects tested, and her test

judgement, insight, and reliability were good.  (R. 353.)  Dr.

Fischetto diagnosed schizoaffective disorder, bipolar type, and

personality disorder, NOS, and assessed a GAF score of 55.  (*Id.*)

His prognosis was "fair," adding that Plaintiff could benefit from

ongoing psychiatric and psychological help to maintain her

stability and functioning.  (R. 354.)  Regarding activities of

daily living, he noted that Plaintiff was able to drive and she was

able to shop though she did not like to, and she was also able to

cook and clean; regarding social functioning, he noted that it was

limited in that Plaintiff did not like socializing; regarding

concentration, persistence, and pace, he noted it was good for the

7

most part but a little slow at times. (*Id.*) He recorded the following clinical findings: "Mood swings with psychosis and anxiety and depressed at times." (*Id.*)

On February 5, 2013, Plaintiff said she wanted to change her depression medications. (R. 369.) Dr. Farrington prescribed Wellbutin and noted he would follow up as needed. (R. 369.)

On May 14, 2013, Plaintiff reported to Dr. Farrington that her emotions were "all over the place." (R. 373.) She also said her psychiatrist had moved from the practice and she was awaiting contact from the office about another doctor. (*Id.*) General examination showed that Plaintiff was alert, in no distress, and answered questions appropriately. (*Id.*) Dr. Farrington encouraged Plaintiff to recontact the psychiatrist regarding the need for a follow up appointment or counseling. (*Id.*)

On July 11, 2013, Plaintiff's husband called Dr. Farrington's office to report that Plaintiff had talked about killing herself but he was able to calm her down. (R. 455.) He also reported that Plaintiff felt like she was being attacked when she went to sleep. (*Id.*) Mr. Yoder wanted the doctor to talk to Plaintiff about her medications, noting that previous medications had worked better but Plaintiff was afraid of gaining weight. (*Id.*)

On August 25, 2013, Plaintiff presented to Memorial Hospital reporting suicidal ideation with a plan to cut her wrists or overdose. (R. 379, 380.) Mental Status Exam showed the following:

Plaintiff was oriented to person, place and time; she had good eye contact; her motor activities and level of consciousness were appropriate, trusting, and cooperative; her speech was normal and mood calm; she reported being sad, hopeless, and lacked energy; she was worried and had nightmares; she had a broad affect and poor sleep patterns; her appetite was increased; her thought process was logical, relevant, goal-directed and organized and her thought content was normal; she reported audio and visual hallucinations; judgment was "Impaired, Mild, Impulsive"; her insight was limited; and her intellect was average. (R. 381.) Plaintiff agreed to be admitted to Pennsylvania Psychiatric Institute ("PPI") and authorization was obtained for a two-day admission with a review on August 27, 2013. (R. 382, 383.)

Upon admission to PPI on August 26, 2013, Plaintiff reported that the reason for her suicidal ideation was that it would make her mother happy  because she could get all her money back, and stressors included relational problems with her husband from whom she was separated, her mother, financial problems, separation from her seven-year-old daughter because the child's father (Plaintiff's second husband) had custody. (R. 412.) Past Psychiatric History indicated 2004 and 2010 psychiatric hospitalizations and it was noted that Plaintiff did not currently have an outpatient psychiatrist or therapist but she had previously been in therapy for a couple of months. (R. 413.) Mental Status Exam showed that

Plaintiff's

>speech was spontaneous, fluent, logical but
>normal rate, rhythm, tone and volume.  She
>describes her mood as depressed.  Her affect
>was constricted.  Thought process was linear,
>goal directed and organized without loosening
>of associations.  Thought content: She denies
>any active or passive suicidal ideation.
>Denies any homicidal ideation.  She was able
>to contract for safety.  She reports a
>history of hearing voices and seeing
>holograms of her ex-husband's brother, who
>passed away a couple of years ago; however,
>currently, she denies any auditory or visual
>hallucinations and denies any paranoid
>ideations.  No obsessions.  No compulsions.
>She was oriented to person, place and time.
>Her insight and judgment remains fair.

(R. 414.)  The Diagnostic Formulation Axis I stated "Rule out major depressive disorder, recurrent, moderate to severe with psychotic features, rule out history of bipolar disorder, NOS; rule out generalized anxiety disorder."  (*Id.*)  Plaintiff's was assessed a GAF score of 28.  (*Id.*)

Plaintiff was discharged from PPI on August 29, 2013, with referrals to WellSpan Behavioral Health for psychiatry and Poloni & Associates for counseling.  (R. 420.)  Appointments were set up at both for September 17, 2013.  (*Id.*)  Her diagnosis was Bipolar I Disorder, Most Recent Episode Manic, Severe with Psychotic Features.  (R. 421.)  Plaintiff was assessed a discharge GAF score of 55 with a GAF of 75 noted to be the highest in the preceding year.  (*Id.*)  Discharge medications were Lamital for mood swings, Remeron for depression, Risperdal of psychosis, Xanax for anxiety,

10

and Oxycontin for pain.  (R. 420-21.)

Plaintiff was seen by Andrew T. Winand, M.D., at Gotham Internal Medicine for follow up of multiple chronic illnesses, depression, and back pain.  (R. 493.)  Dr. Winand noted that Plaintiff was to follow up with psychiatry the following month, and he recommended that she talk with her psychiatrist about restarting Zyprexa because of increasing paranoia.  (*Id.*)

On March 10, 2014, Plaintiff was seen for medication management at WellSpan Behavioral Health by Dr. Muneses.  (R. 515-17.)  Plaintiff reported that paranoid thoughts returned after she stopped taking Zyprexa because she thought it caused weight gain.  (R. 515.)  She said these thoughts occurred about two or three times a month and were generally of the theme that her husband was going to kill her.  (*Id.*)  Plaintiff also reported trouble sleeping due to paranoid thoughts, and she requested a medication change for depression and anxiety.  (*Id.*)  Dr. Muneses found Plaintiff's mood depressed and anxious, her affect reactive, and she had paranoid delusions and auditory hallucinations.  (R. 516.)  He assessed schizoaffective disorder, adjusted Plaintiff's medications, and noted that she would return in two months to see a nurse for medication management and in four months to see a physician.  (R. 515.)

Plaintiff again saw Dr. Muneses on April 8, 2014.  (R. 513-14.)  He noted that Plaintiff transitioned well to the new

11

medications but she reported that the paranoid thoughts persisted, specifically she had thoughts that her husband was molesting her daughter when she knew this was not true. (R. 513.) Dr. Muneses found Plaintiff's mood to be anxious, her affect reactive, and she had persecutory, paranoid delusions. (R. 513.)

b.   *Physical Impairments*

As a result of two motor vehicle accidents, Plaintiff has lumbar and cervical spondylosis. On February 5, 2013, Plaintiff had cervical and lumbar spine x-rays. (R. 364-65.) The cervical spine study showed no acute cervical spine abnormality and no subluxation or extension. (R. 364.) The lumbar spine study shows mild disc space narrowing at L5-S1 and no acute fracture or malalignment. (R. 365.)

On February 25, 2013, Plaintiff complained to Dr. Farrington of pain in her neck and back. (R. 368.) Spring Grove Family Care Center records show that Plaintiff continually complained of back pain for which Dr. Farrington prescribed oxycodone. (*See*, *e.g.*, R. 374, 376, 450, 451.)

Dr. Winand of Gotham Internal Medicine examined Plaintiff on August 16, 2013, and found she had normal alignment and mobility of her head and neck, normal alignment and mobility of her spine/ribs/pelvis, and normal gait/station with no difficulty ambulating. (R. 505.)

On September 23, 2013, Dr. Winand found straight leg raising

to only about thirty degrees on the left with pain in the lumbar area, somewhat diminished dorsiflexion and plantar flexion in the left foot, and normal gait. (R. 501.) He advised and ordered a referral to WellSpan orthopedics for further evaluation of chronic back pain with radiculopathy. (R. 499.)

At a follow up appointment on November 22, 2013, Plaintiff reported that her back pain was still bothersome and she was taking oxycodone daily for the pain which radiated down both legs. (R. 497.) Plaintiff also reported numbness in both legs after sitting for about ten minutes. (*Id.*) Dr. Winand reported on physical exam that Plaintiff had mild posterior cervical tenderness, a normal gait, and five out of five lower extremity strength. (R. 498.) He ordered an MRI of the lumbar spine. (R. 496.)

On January 30, 2014, Dr. Winand found that Plaintiff had four out of five lower extremity strength and normal gait. (R. 495.) His Assessment included chronic pain syndrome and lumbar radiculopathy. (R. 493.) Dr. Winand noted that he would start Plaintiff on Gabapentin for the neuropathic pain related to lumbar radiculopathy and decrease oxycodone from fifteen to ten milligrams per day. (*Id.*) He also noted that Plaintiff was to follow up with neurosurgery. (*Id.*)

On March 7, 2014, Plaintiff was seen at Wellspan Orthopedics-York by Pawal Ochalski, M.D. for an orthopedic consultation. (R. 429-32.) He noted that Plaintiff presented with worsening low back

discomfort, she rated her pain as moderate to severe, she had some radiating symptoms into her left leg, some numbness as well as neck pain, and some intermittent numbness in her upper extremities.  (R. 429.)  Dr. Ochalski also noted that the symptoms had been long-standing but, due to health care access issues, she had just recently obtained the ability to see a specialist.  (*Id.*)  Motor examination revealed 5/5 strength in both upper and lower extremities, sensation to light touch and pin prick was normal and symmetric in all four extremities, deep tendon reflexes were 3+ throughout, and her gait was mildly ataxic on tandem gait.  (*Id.*)  Dr. Ochalski stated that MRI of the cervical and lumbar spine were warranted in light of the clinical findings of hyperflexia, failed conservative therapies and evidence of moderate degenerative changes at L5-1.  (*Id.*)  He also noted that Plaintiff would be referred to pain management to address her severe intractable lower back discomfort.  (*Id.*)

On March 24, 2014, Neila Parrish, CRNP, of WellSpan Interventional Pain Management saw Plaintiff for an initial evaluation.  (R. 525.)  Plaintiff was to have an MRI on the same day and was scheduled for a lumbar epidural steroid injection.  (R. 526.)  Ms. Parrish also noted that Plaintiff would likely benefit from physical therapy.  (*Id.*)

Plaintiff's March 18, 2014, cervical spine MRI showed "[m]inimal degenerative disc disease at C5-C6.  The other cervical

14

levels appear normal." (R. 435.)

Plaintiff's March 24, 2014, lumbar spine MRI showed

degenerative disc disease at both L4-L5 and
L5-S1. Small tear in the central annulus
and small disc protrusion at L4-L5. No
spinal canal stenosis. Moderate to severe
degenerative disc disease at L5-S1 with
irregular bulging of the annulus, central
disc protrusion, and moderate stenosis of
the left neural foramen. No focal disc
herniation.

(R. 433.)

Plaintiff again saw Dr. Ochalski on April 8, 2014. (R. 425.)
He noted her history of chronic back pain with acute exacerbation,
some radiation to the legs over the preceding two months, and a
report of intermittent hand numbness with elevation of her arms--
symptoms which she said limited her abilities. (*Id.*) His review
of Plaintiff's MRI of the cervical spine showed no evidence of
severe cord or neural element compression and some spondylotic
changes. (*Id.*) Review of the MRI of the lumbar spine revealed
multilevel spondylosis at L4-5 and L5 one due to disc degenerative
disease and facet arthropathy with no evidence of nerve element
compression. (*Id.*) Dr. Ochalski recommended epidural steroid
injection and noted that surgical intervention was not warranted at
the time but if the symptoms in her arms got worse he would
recommend referral to thoracic surgery. (*Id.*)

On April 10, 2014, Plaintiff saw To-Nhu Vu, M.D., of WellSpan
Interventional Pain Management for evaluation and steroid

injection.  (R. 520.)  He recorded that Plaintiff complained of
pain predominantly in the low back radiating down to the hip, left
greater than right, traveling to the area around the knees, and
some numbness and tingling.  (*Id.*)

## 2.  **Opinion Evidence**

*a.  Mental Impairment Opinions*

Based on the evaluation set out in the Impairment Evidence
section above, Dr. Fischetto opined that Plaintiff had slight
restrictions in the following abilities: understand, remember and
carry out short, simple instructions; understand, remember and
carry out detailed instructions; interact appropriately with the
public; interact appropriately with supervisors; and interact
appropriately with co-workers.  (R. 355.)  He found she had marked
restrictions in the following abilities: make judgments on simple,
work-related decisions; respond appropriately to work pressures in
a usual work setting; and respond appropriately to changes in a
routine work setting.  (*Id.*)  Dr. Fischetto noted that these
assessments were supported by clinical findings of mood swings with
psychosis and anxiety as well as depression at times.  (*Id.*)

Psychiatrist Vassili Arkadiev, M.D., completed a Medical
Source Statement of Ability to Do Work-Related Activities (Mental)
on April 11, 2013.  (R. 422-24.)  He found the following: Plaintiff
had a mild restriction in her ability to understand and remember
simple instructions; she had a moderate restriction in her ability

16

to make judgments on simple work-related decisions; she had marked restrictions in her abilities to carry out simple instructions, understand and remember complex instructions, and carry out complex instructions; she had extreme restrictions in her abilities to make judgments on complex work-related decisions, interact appropriately with the public, supervisors and coworkers, and respond appropriately to usual work situations and to changes in a routine work setting.  (R. 422-23.)  Dr. Arkadiev identified Plaintiff's schizoaffective disorder which interferes with her ability to work as a factor that supported his assessment.  (*Id.*)  He also noted that Plaintiff had delusional ideas, hallucinations and depressed mood.  (R. 423.)  He identified November 30, 2012, as the date he found the limitations first present.  (*Id.*)

On June 17, 2014, Dr. Muneses completed a Mental Impairment Questionnaire.  (R. 533-38.)  He noted "Frequency and length of contact" to be March 10, 2014.  (R. 533.)  His diagnosis was schizoaffective disorder and he assessed a GAF score of 50.  (*Id.*) He noted that Geodon, Lamictal, Lexapro, and Xanax helped somewhat with the side effect of sedation.  (*Id.*)  Clinical findings included mood swings and poor concentration, and his prognosis was "fair."  (*Id.*)  Dr. Muneses identified the following signs and symptoms: decreased energy; mood disturbance; emotional withdrawal or isolation; emotional lability; easy distractibility; and decreased need for sleep.  (R. 534.)  Regarding mental abilities

17

and aptitudes needed to do unskilled work, Dr. Muneses found that
Plaintiff was seriously limited, but not precluded, in the
following areas: remember work-like procedures; understand and
remember very short and simple instructions; maintain attention for
two hour segment; maintain regular attendance and be punctual
within customary, usually strict tolerances; sustain an ordinary
routine without special supervision; work in coordination with or
proximity to others without being unduly distracted; make simple
work-related decisions; complete a normal workday and workweek
without interruptions from psychologically based symptoms; perform
at a consistent pace without an unreasonable number and length of
rest periods; ask simple questions or request assistance; accept
instructions and respond appropriately to criticism from
supervisors; get along with coworkers or peers without unduly
distracting them or exhibiting behavioral extremes; respond
appropriately to changes in a routine work setting; deal with
normal work stress; be aware of normal hazards and take appropriate
precautions; understand and remember detailed instructions; carry
out detailed instructions; set realistic goals or make plans
independently of others; deal with stress of semiskilled and
skilled work; interact appropriately with the general public;
maintain socially appropriate behavior; adhere to basic standards
of neatness and cleanliness; travel in unfamiliar places; and use
public transportation.  (R. 535-36.)  He opined that Plaintiff's

18

psychiatric condition did not exacerbate Plaintiff's experience of pain or any other physical symptoms.  (R. 536.)  He further opined that Plaintiff had marked limitations in her activities of daily living, marked difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence or pace, and she had three episodes of decompensation within a twelve month period, each of at least two weeks duration.  (R. 537.)  Dr. Muneses did not note how long Plaintiff's impairment had lasted or was expected to last, but he opined that Plaintiff was not a malingerer.  (R. 538.)

b.   *Physical Impairment Opinion*

    Mary Ellen Wyszomierski, M.D., a State agency reviewer, completed a Residual Functional Capacity Assessment on December 28, 2012.  (R. 123-25.)  She found the following exertional limitations: Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; she could stand and/or walk for six hours in an eight-hour workday and sit for the same amount of time; her abilities to push and/or pull were unlimited except as shown for lift and/or carry.  (R. 123-24.)  Dr. Wyszomierski found the following postural limitations: Plaintiff could occasionally climb ramps, stairs, and ladders; and she could occasionally balance stoop, kneel, crouch, and crawl.  (R. 124.)  She concluded that Plaintiff had no manipulative limitations, but had environmental limitations in that she should avoid concentrated

exposure to wetness, vibration and hazards.  (R. 124-25.)

### 3.   Hearing Testimony

At the July 21, 2014, hearing, Plaintiff testified that she left her last job as a personal care attendant because her moods were unstable, she called off frequently, and she had a driving situation which caused her to have extreme anxiety.  (R. 39.)  At the time she thought she may be able to be a personal care attendant for someone closer to her home but no such client was available.  (R. 40.)  Plaintiff also said she looked for work after she left that job in August 2012 but did not find anything.  (R. 40.)  At the time of the hearing, Plaintiff said she did not know if she was capable of holding a steady job because of her medication situation.  (R. 41.)

Plaintiff testified that the main medication side effect was sedation.  (R. 66.)  She added that the sedating effects of Xanax could last all day and the sedating effects of Oxycodone wore off in about four hours.  (R. 67.)  Plaintiff said that she fell asleep several times a day as a result of the medications.  (R. 68.)  She added that she instructed her children not to go outside and her older daughter knew she was going to take a nap.  (R. 68-69.)

Plaintiff also said that the main mental health problem she was having at the time of the hearing was night terrors where she was conscious but could not move her body and she felt like someone was suffocating her.  (R. 77.)  Plaintiff noted that she did not

20

want to go to sleep because she did not want this to happen and medications had not yet helped the problem.  (R. 77-78.)

**4.   ALJ Decision**

As noted above, ALJ Zanotto issued his decision on February 3, 2015.  (R. 13-23.)  ALJ Zanotto made the following Findings of Fact and Conclusions of Law:

> 1.   The claimant meets the insured status requirements of the Social Security Act through March 31, 2016.
>
> 2.   The claimant has not engaged in substantial gainful activity since August 17, 2012, the amended onset date (20 CFR 404.1571 *et seq.*).
>
> 3.   The claimant has the following severe impairments: lumbar and cervical spondylosis; mood disorder; anxiety disorder; and personality disorder (20 CFR 404.1520(c)).
>
> 4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she is restricted to work that can be learned within one month with occasional decision-making and jobs that do not require precise limits, tolerances or standards or require her to direct, control or plan the activities of others or influence people's opinions and judgments; is limited to jobs that require no

21

teamwork; no public interactions; and occasional interaction with supervisors.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.   The claimant was born on July 11, 1978 and was 33 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Consideration the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404-1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 17, 2012, through the date of this decision (20 CFR 404.1520(g)).

(R. 15-23.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

22

determine whether a claimant is disabled.[1]  It is necessary for the
Commissioner to ascertain: 1) whether the applicant is engaged in a
substantial activity; 2) whether the applicant is severely
impaired; 3) whether the impairment matches or is equal to the
requirements of one of the listed impairments, whereby he qualifies
for benefits without further inquiry; 4) whether the claimant can
perform his past work; 5) whether the claimant's impairment
together with his age, education, and past work experiences
preclude him from doing any other sort of work.  20 C.F.R. §§
404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S.
521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment,
the ALJ makes a finding about the claimant's residual functional

---

[1]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less that 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 22-23.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third

24

Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence—-particularly certain types of evidence (e.g., that offered by treating physicians)—-or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result

25

but also indicate what evidence was rejected: "Since it is apparent
that the ALJ cannot reject evidence for no reason or the wrong
reason, an explanation from the ALJ of the reason why probative
evidence has been rejected is required so that a reviewing court
can determine whether the reasons for rejection were improper."
*Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an
exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v.
Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement
that the ALJ discuss in its opinion every tidbit of evidence
included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d
Cir. 2004).  "[W]here [a reviewing court] can determine that there
is substantial evidence supporting the Commissioner's decision, . .
. the *Cotter* doctrine is not implicated."  *Hernandez v. Comm'f of
Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not
precedential).

A reviewing court may not set aside the Commissioner's final
decision if it is supported by substantial evidence, even if the
court would have reached different factual conclusions.  *Hartranft*,
181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d
1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings
of the Commissioner of Social Security as to any fact, if supported
by substantial evidence, shall be conclusive . . .").  "However,
even if the Secretary's factual findings are supported by
substantial evidence, [a court] may review whether the Secretary,

in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

As noted previously, Plaintiff asserts that the Acting Commissioner's decision should be remanded for the following reasons: 1) the ALJ erred at step three of the sequential evaluation process by finding Plaintiff did not meet or equal Listings 12.04 and 12.08 and by not evaluating her schizoaffective disorder under medical listing 12.03; 2) substantial evidence does not support the ALJ's evaluation of the opinion evidence; 3) substantial evidence does not support the ALJ's RFC assessment; 4) the ALJ improperly evaluated Plaintiff's GAF scores; and 5) substantial evidence does not support the ALJ's credibility

assessment.   (Doc. 11 at 2.)

**A.    *Step Three Determination***

Plaintiff argues that ALJ Zanotto erred by finding she did not meet or equal Listings 12.04 and 12.08 due to her depressive disorder and personality disorder and by not evaluating her schizoaffective disorder under listing 12.03.   (Do. 11 at 13,16.) Defendant maintains that substantial evidences supports the ALJ's step three findings.   (Doc. 12 at 5.)   I conclude Plaintiff has not shown that the claimed step three errors are cause for remand.

A claimant bears the burden of establishing that his impairment meets or equals a listed impairment.   *Poulos v. Comm'r of Social Security*, 474 F.3d 88, 92 (3d Cir. 2007).

**1.    Listings 12.04 and 12.08**

Listing 12.04 states:

> 12.04: Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A.   Medically documented persistence, either continuous or intermittent, or one of the following:
>
> > 1.   Depressive syndrome characterized by at least four of the following: a. Anhedonia or pervasive loss of interest in almost all activities; or b.

28

Appetite disturbance with change in weight; or C. Sleep disturbance; or d. Psychomotor agitation or retardation; or e. Decreased energy; or f. Feelings of guilt or worthlessness; or g. Difficulty concentrating or thinking; or h. Thoughts of suicide, or I. Hallucinations, delusion or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following: a. Hyperactivity; or b. Pressure of speech; or C. Flight of ideas, or d. Inflated self-esteem; or e. Decreased need for sleep; or f. Easy distractibility; or g. Involvement in activities that have a high probability of painful consequences which are not recognized; or h. Hallucinations, delusions or paranoid thinking; or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B.  Resulting in at least two of the following:

1. Marked restriction of activities of daily living or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

29

C.  Medically documented history of chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1.  Repeated episodes of decompensation, each of extended duration; or

    2.  A residual disease process that has resulted in such a marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

    3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.

Listing 12.08 states:

A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long term functioning and are not limited to discrete episodes of illness.

The required level of severity for this disorder is met when the requirements of both A and B are satisfied.

A.  Deeply ingrained, maladaptive patterns of behavior associated with one of the following:

    1.  Seclusiveness or autistic thinking; or

30

2.  Pathologically inappropriate suspiciousness or hostility; or

3.  Oddities of thought, perception, speech and behavior; or

4.  Persistent disturbances of mood or affect; or

5.  Pathological dependence, passivity, or aggressivity, or

6.  Intense and unstable interpersonal relationships and impulsive and damaging behavior;

AND

B.  Resulting in at least two of the following:

1.  Marked restriction of activities of daily living; or

2.  Marked difficulties in maintaining social functioning; or

3.  Marked difficulties in maintaining concentration, persistence, or pace; or

4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.08.

"A 'marked' restriction or difficulty is one that is more than moderate but less than extreme and that 'interfere[s] seriously with [the] ability to function independently, appropriately, effectively, and on a sustained basis.'" *Cunningham v. Comm'r of Soc. Sec.*, 507 F. App'x 111, 116 (3d Cir. 2012) (citing 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00(C)).

31

Plaintiff first supports her claimed error with the general averment that she meets the paragraph A criteria of listing 12.04 because she has mood swings, paranoia, poor concentration, increased appetite, hopeless feelings, suicidal and homicidal ideations, and decreased sleep, energy, and interest in activities. (Doc. 11 at 13-14 (citing R. 518, 340, 366, 373, 379, 381, 384-411, 412-21, 493, 513).)  She generally avers that she meets the paragraph A criteria of listing 12.08 because she has pathologically inappropriate suspiciousness or hostility, pointing to records indicating she has inappropriate suspicions that her husband is going to kill her and that he is molesting her daughter. (*Id.* at 14 (citing R. 455, 515, 513).)

Plaintiff next asserts that she meets the paragraph B criteria of the listings because she has marked limitations in maintaining social functioning and marked restrictions in concentration persistence or pace.  (Doc. 11 at 14-16.)  As set out above, the paragraph B criteria are the same for listings 12.04 and 12.08.

To support the claimed social functioning limitation, Plaintiff relies on Dr. Arkadiev's opinion that she had "extreme" limitations in her ability to make judgments on complex work-related decisions, interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, and respond appropriately to usual work situations and to changes in a routine work setting.  (*Id.* (citing R. 423).)

32

Plaintiff also notes that numerous treatment records show that she suffers from paranoia and homicidal ideations and in past employment she was suspicious that people were plotting against her and wanted to get her fired. (*Id.* (citing R. 349).)

Noting that "[s]ocial functioning 'refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals,'" including "'the ability to get along with others such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers,'" Defendant adds that "'a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation'" can demonstrate impaired functioning in this area. (Doc. 12 at 6 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(2)).) Defendant then points to ALJ Zanotto's reasoning that Plaintiff had only moderate restrictions in this area because she had no trouble with the law, was never fired or evicted, she interacted appropriately with medical staff, socialized with her parents, and the reviewing state agency physician opined that Plaintiff's mental impairments resulted in, at most, moderate limitations in social functioning. (Doc. 12 at 6-7 (citing R. 17, 55-56, 75, 122, 251).)

Because we must rely only on the rationale relied upon by the ALJ, *see Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001), we parse out any *post hoc* reasons for supporting the ALJ's decision

now provided by Defendant.  ALJ Zanotto cited only the facts that
Plaintiff had no trouble with the law, was never fired or evicted,
and she interacted appropriately with treating and nontreating
sources.  (R. 17.)

     The ALJ did not review the evidence cited by Plaintiff, i.e.,
Dr. Arkadiev's assessment of extreme limitations.  However,
Plaintiff does not show that the extreme limitations found by Dr.
Arkadiev are supported by the record.  Insofar as ALJ Zanotto
attributed little weight to the opinion (R. 21) and Plaintiff does
not argue that this was error in her criticism of the ALJ's
evaluation of opinion evidence (see Doc. 11 at 17-21), Plaintiff's
reliance on Dr. Arkadiev's extreme limitation assessments is
misplaced.  Further, a review of Plaintiff's citations to the
record in support of her assertion that she "suffers from paranoia
and homicidal ideations," shows at most that she once noted that
she had homicidal thoughts at times (R. 366) and she at times
reported paranoia and/or was assessed with paranoid delusions.  (R.
493, 513, 516.)  Plaintiff's citation to her WellSpan Health
February 10, 2012, visit includes Dr. Muneses' notation that
Plaintiff reported paranoia by history and she denied "any symptoms
consistent with social phobia."  (R. 518.)  Plaintiff's citation to
record page 349 does not indicate that she was suspicious, during
past employment, that people were plotting against her and wanted
to get her fired.  (Doc. 11 at 15.)  However, elsewhere in the

34

record, Dr. Fischetto noted under "Occupational Adjustment" that Plaintiff reported such suspicion and "said she can't work now because she has anxiety driving." (R. 351.) Because a "marked" restriction or difficulty is one that seriously interferes with the ability to function independently, appropriately, effectively, and on a sustained basis, *Cunningham*, 507 F. App'x at 116 (citing 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.00(C)), Plaintiff's citations to the record do not satisfy her burden of showing the ALJ erred in assessing that she had only moderate difficulties in social functioning. (R. 17.)

Finding Plaintiff has not met her burden of showing the ALJ erred in finding she did not have a marked impairment in maintaining social functioning, Plaintiff cannot show she had the requisite marked restrictions in two paragraph B categories. Therefore, she has not shown that the ALJ's assessment of listings 12.04 and 12.08 was error.

## 2.  **Listing 12.03**

Plaintiff also contends the ALJ erred at step three by not evaluating her schizoaffective disorder under listing 12.03. (Doc. 11 at 16.) As Defendant notes, Plaintiff recognizes that she would have to demonstrate marked limitations in maintaining social functioning and marked difficulties in concentration, persistence, or pace in order to meet this listing. (Doc. 12 at 12 (citing Doc. 11 at 17).) As discussed above, Plaintiff has not shown that she

35

has marked limitations in maintaining social functioning.
Therefore, I agree with Defendant, an error regarding listing 12.03
would be harmless.  (Doc. 12 at 13 (citing *Shinseki v. Sanders*, 566
U.S. 396, 409-10 (2009); *Molina v. Astrue*, 674 F.3d 1104, 1111,
1115-22 (9ᵗʰ Cir. 2012); *Coy v. Astrue*, No. 08-1372, 2009 WL
2043491, at *14 (W.D. Pa. July 8, 2009)).)

**B.     *Opinion Evidence***

Plaintiff next claims the ALJ erred in her evaluation of
opinion evidence.  (Doc. 11 at 17.)  Defendant responds that
substantial evidence supports the ALJ's analysis of medical
opinions.  (Doc. 12 at 13.)  I conclude this claimed error is cause
for remand.

**1.     <u>Dr. Muneses' Opinion</u>**

Plaintiff contends that the ALJ erred in determining Dr.
Muneses' opinion was entitled to little weight on the basis that it
was not consistent with the longitudinal record because his opinion
was corroborated by the longitudinal record and by two other
medical source opinions.  (Doc. 11 at 18.)  Defendant responds that
the ALJ properly gave little weight to Dr. Muneses' opinion.  (Doc.
12 at 13.)  This claimed error is cause for remand because the
Court cannot conclude the ALJ's determination is supported by
substantial evidence.

Under applicable regulations and the law of the Third Circuit,
a treating medical source's opinions are generally entitled to

controlling weight, or at least substantial weight.  *See*, *e.g.*,
*Fargnoli v. Halter*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20
C.F.R. § 404.1527(c)(2); *Cotter v. Harris*, 642 F.2d 700, 704 (3d
Cir. 1981)).  Sometimes called the "treating physician rule," the
principle is codified at 20 C.F.R. 404.1527(c)(2), and is widely
accepted in the Third Circuit.  *Mason v. Shalala*, 994 F.2d 1058 (3d
Cir. 1993); *see also Dorf v. Brown*, 794 F.2d 896 (3d Cir. 1986).
The regulation addresses the weight to be given a treating source's
opinion: "If we find that a treating source's opinion on the
issue(s) of the nature and severity of your impairment(s) is well-
supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other
substantial evidence in your case, we will give it controlling
weight."  20 C.F.R. § 404.1527(c)(2).[2]  "A cardinal principle

---

[2] 20 C.F.R. § 404.1527(c)(2) states in relevant part:

> Generally, we give more weight to opinions from
> your treating sources, since these sources are
> likely to be the medical professionals most
> able to provide a detailed, longitudinal
> picture of your medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations. If we find that a treating
> source's opinion on the issue(s) of the nature
> and severity of your impairment(s) is well-
> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial
> evidence in your case record, we will give it

guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citations omitted); see also *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008).  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317 (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988)).

The Court of Appeals for the Third Circuit addressed a plaintiff's argument that an ALJ failed to give controlling weight to the opinion of a treating physician in *Horst v. Commissioner of Social Security*, 551 F. App'x 41, 46 (3d Cir. 2014) (not

controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

precedential).

> "Under applicable regulations and the law of
> this Court, opinions of a claimant's treating
> physician are entitled to substantial and at
> times even controlling weight." *Fargnoli v.
> Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).
> Controlling weight is given when a treating
> physician's opinion is "well supported by
> medically acceptable clinical and laboratory
> diagnostic techniques and is not inconsistent
> with the other substantial evidence."  20
> C.F.R. § 404.1527(d)(2).  "Although the ALJ
> may weigh the credibility of the evidence, he
> must give some indication of the evidence that
> he rejects and his reason(s) for discounting
> that evidence."  *Fargnoli*, 247 F.3d at 43.

551 F. App'x at 46.  *Horst* noted that neither the ALJ nor the court

needed to rely on the treating physician's opinion that the

plaintiff was completely disabled: "As an initial matter, 'the

ALJ--not treating or examining physicians or State agency

consultants--must make the ultimate disability and RFC

determinations."  551 F. App'x at 46 n.7 (quoting *Chandler v.

Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011); citing 20

C.F.R. § 404.1527(d)).  Although it is true that an ALJ's

credibility judgments alone cannot override a treating physician's

medical opinion that is supported by the evidence, *Morales v.

Apfel*, 225 F.3d 310, 310 (3d Cir. 2003), where an ALJ relies "upon

more than personal observations and credibility determinations in

discounting the treating physician's finding of disability," the

ALJ does not run afoul of relevant law.  *Drejka v. Commissioner of

Social Security*, 61 F. App'x 778, 782 (3d Cir. 2003) (not

39

precedential) (distinguishing *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (holding that an ALJ's credibility judgments alone cannot override a treating physician's medical opinion that is supported by the evidence)).  *Drejka* also noted that where the treating physician made the determination the plaintiff was disabled only in a form report, the Third Circuit Court has characterized a report, "in which the physician's only obligation was to fill in the blanks, as 'weak evidence at best.'"   61 F. App'x at 782 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)).

ALJ Zanotto accorded little weight to Dr. Muneses' opinion on the basis that "the opinion is not consistent with the longitudinal record or the doctor's own progress notes, which reveal the claimant as oriented, well-groomed, focused attention, normal speech, goal-directed thought process, reactive affect, intact associations, and appropriate judgment, insight, and recent and remote memory."  (R. 21 (citing Exs. 3F, 15F).)

In support of her assertion that remand is warranted because the ALJ failed to evaluate the entire medical evidence as a whole, Plaintiff points to mental status examinations which showed depression, anxiety, auditory and visual hallucinations, impaired/impulsive judgment, limited insight, paranoid delusions, and suicidal ideations.  (Doc. 11 at 18-19 (citing R. 379, 381, 516).)

The exhibits relied upon by ALJ Zanotto in forming her conclusion that Dr. Muneses' opinion was entitled to little weight include some of the mental status examinations cited by Plaintiff in that record pages 379 and 381 are found in Exhibit 15F.  The ALJ's reliance on this exhibit cannot be considered substantial evidence because she did not address probative evidence contained therein.  While Exhibit 15F contains the findings cited by the ALJ, it also contains objective findings which could be construed as supportive of Dr. Muneses' opinion such as depressed and anxious mood, persecutory and paranoid delusions, and auditory hallucinations.  (R. 513, 516.)  Because an "explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper," *Cotter*, 642 F.2d at 706-07, this matter must be remanded for further consideration.

Regarding Exhibit 3F, in as much as the Court can only guess at what information is recorded in this exhibit (a handwritten largely illegible one page Psychiatrist Progress Note from WellSpan Behavioral Health), the Court cannot determine what evidence it contains, supportive of ALJ Zanotto's opinion or not.  (R. 326.)

Further, the reconsideration of the Dr. Muneses' opinion upon remand is especially important in that the Third Circuit Court has recognized that for a claimant like Plaintiff who has a mental impairment like "an affective or personality disorder marked by

anxiety, the work environment is completely different from home or a mental health clinic." *Morales*, 225 F.3d at 319 (The treating physician's "opinion that [the claimant's] ability is seriously impaired or nonexistent in every area related to work shall not be supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stress that accompany the work setting.") *Morales* further explains that "[t]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving mental disability.  This Court has said before that an ALJ's observations of the claimant 'carry little weight in cases . . . involving medically substantiated psychiatric disability.'" *Id.* (quoting *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984)).

## 2.    **Dr. Fischetto's Opinion**

Plaintiff asserts that the ALJ erred in disregarding Dr. Fischetto's opinion because the opinion is consistent with his findings and the record as a whole.  (Doc. 11 at 19.)  Defendant responds that substantial evidence supports the ALJ's determination.  I conclude the ALJ's explanation of her assessment of Dr. Fischetto's opinion is deficient in that she does not address mental status examination findings that could be construed as supportive of his opinion.  (R. 352-53.)  Because the matter must be remanded on the basis identified above, further explanation of the weight accorded Dr. Fischetto's opinion is also warranted.

C.    *RFC Assessment*

     Plaintiff maintains that substantial evidence does not support the ALJ's RFC assessment because the ALJ failed to take Plaintiff's physical limitations into consideration when devising the RFC and did not adequately consider the limitations resulting from her mental impairments.  (Doc. 11 at 22-23.)   Because I have concluded that remand is required to properly assess the opinions of Dr. Muneses and Dr. Fischetto, an assessment of the limitations resulting from Plaintiff's mental health impairments may also be appropriate upon remand.  For the reasons discussed below, the physical limitation aspect of the RFC should also be reconsidered upon remand.

     In her explanation of her RFC assessment, ALJ Zanotto stated "[a]s to the claimant's physical complaints, in March 2014, muscle strength was 5/5, and flexion and lateral rotation of the neck were normal (Exhibit 16F, page 9).  Records document that the claimant mostly called in for prescription refills (Exhibit 13F)."  (R. 20.)

     Plaintiff points to diagnostic findings and other medical evidence of record regarding related symptoms.  (Doc. 11 at 22-23.) Specifically, Plaintiff cites to records which demonstrate that she suffered from pain, radiation and numbness from her lower back into her legs bilaterally, tenderness, and gait dysfunction as well as records showing her pain was exacerbated by sitting, standing, and walking.  (Doc. 11 at 23 (citing R. 371 429, 496-97, 525, 528).)

Defendant argues that the ALJ's limitation of Plaintiff to light work sufficiently accounts for Plaintiff's back and neck complaints in that light work involves lifting no more than twenty pounds at a time and the frequent lifting or carrying of objects weighing up to ten pounds.  (Doc. 12 at 19.)

While the limitation to light work may account for some problems related to Plaintiff's physical impairments, the ALJ's very brief analysis does not provide substantial evidence that limitations associated with her physical impairments were adequately accounted for in the RFC.  (*See* R. 20.)   Plaintiff's citations and the record evidence discussed in the background section of this Memorandum show that the ALJ did not discuss probative evidence regarding limitations related to Plaintiff's physical impairments.  (*Id.*)  As the Court concluded regarding the consideration of Dr. Muneses' opinion, because an "explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper," *Cotter*, 642 F.2d at 706-07, this matter must be remanded for further consideration.

**D.   *GAF Scores***

Plaintiff next argues the ALJ improperly evaluated her GAF scores in that she relied on a GAF score of 55 and did not discuss GAF scores of 28 and 30.  (Doc. 11 at 26.)  As set out in the background section above, Plaintiff's lower GAF scores were

44

assessed in August 2013 when she was admitted to PPI because of suicidal ideation.  (*See* R. 381, 414.)  Plaintiff is incorrect that the ALJ did not discuss the GAF score of 28--ALJ Zanotto noted that this assessment occurred on Plaintiff's admission to the hospital and "she improved quickly with a discharge GAF of 55."  (R. 20.) Thus, Plaintiff's claim that ALJ Zanotto engaged in impermissible "'cherry-picking'" of GAF scores (Doc. 11 at 26) is without merit.

## E.    *Credibility Assessment*

Plaintiff states that substantial evidence does not support the ALJ's credibility assessment in that she improperly relied on her own estimation that Plaintiff's treatment was "routine and conservative in nature," and she did not consider the side effects of Plaintiff's medications.  (Doc. 11 at 28.)  Defendant maintains that substantial evidence supports the ALJ's credibility determination.  (Doc. 12 at 23.)  I conclude that the ALJ's crediblity determination should be reviewed on remand.

The Third Circuit Court of Appeals has stated that "[w]e 'ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor.'"  *Coleman v. Comm'r of Soc. Sec.*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)).  "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence."  *Pysher v. Apfel*, Civ. A. No.

45

00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.  In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true.  When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p.  "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."  SSR 96-7p.

Plaintiff's main criticism of the ALJ's credibility assessment is that the ALJ cited routine and conservative treatment as a reason to undermine his credibility.  (Doc. 11 at 27.)  Plaintiff avers that "[a]n ALJ cannot override treating specialists who provide treatment consisting of therapy and medication."  (*Id.* at 27-28 (citing *Morales*, 225 F.3d at 319).)  Plaintiff also notes that the ALJ did not properly consider medication side-effects. (*Id.* at 27.)

46

Defendant responds that Plaintiff's argument is in direct conflict with the governing regulations which state that the medications a claimant takes and the treatment used to alleviate symptoms is an important indicator of the intensity and persistence of the claimant's symptoms. (Doc. 12 at 24 (citing 20 C.F.R. § 404.1529(c)(3)).) Regarding medication side effects, Defendant states that Plaintiff reported no side effects from her medications to her physicians. (*Id.*)

In that Dr. Muneses' and Dr. Fischetto's opinions are subject to review upon remand, a more thorough analysis may impact the credibility assessment. Further, while Defendant correctly notes that medications taken and treatment received are properly considered in the assessment of a Plaintiff's symptoms, side effects are also properly considered. 20 C.F.R. § 404.1529 (c)(3)(iv). Here the record shows that Plaintiff was on multiple medications for her mental and physical impairments and at times she experienced side effects which she reported to her treating physician. (*See*, *e.g.*, R. 20, 333.) In his opinion, Dr. Muneses noted that sedation related to Plaintiff's medications could have implications for working. (R. 533.) In her function report Plaintiff listed medication side effects including mood shifts, nausea, and drowsiness. (R. 252.) At her hearing, Plaintiff testified that she did not think she could hold a steady job because of her "medication situation" and sedation was the main

47

medication side effect.  (R. 41, 66.)  As discussed in relation to the ALJ's medical opinion analysis, it is important that an ALJ discuss all probative evidence and here the ALJ did not do so. *Cotter*, 642 F.2d at 706-07.  Therefore, the ALJ's credibility assessment should also be reviewed upon remand.

### V. Conclusion

For the reasons discussed above, I conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge


DATED: July 20, 2016